Filed 6/3/26  P. v. Jackson CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DESHAWN LEE JACKSON,<br><br>    Defendant and Appellant. | F088950<br><br>(Super. Ct. No. CF4517156)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Candace Hale, under appointment by the Court of Appeal; DeShawn Lee Jackson, in pro. per., for Defendant and Appellant.

Rob Bonta, Attorney General, and Hannah Janigian Chavez, Deputy Attorney General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Levy, Acting P. J., Snauffer, J. and DeSantos, J.

## **INTRODUCTION**

In 1994, appellant and defendant DeShawn Lee Jackson (defendant) was convicted after a bench trial of second degree murder with a firearm enhancement. He was sentenced to four years plus 15 years to life. The judgment was affirmed on appeal.

In 2022, defendant filed a petition for resentencing pursuant to Penal Code[1] section 1172.6.[2] In 2024, the trial court held there was a prima facie case for relief, issued an order to show cause (OSC), and conducted an evidentiary hearing. It reviewed the record from defendant's bench trial, and denied the petition because it found beyond a reasonable doubt that defendant was guilty of murder as the actual killer.

On appeal, appellate counsel filed a brief which summarized the facts and procedural history with citations to the record, raised no issues, and asked this court to independently review the record pursuant to both *People v. Delgadillo* (2022) 14 Cal.5th 216 (*Delgadillo*) and *People v. Wende* (1979) 25 Cal.3d 436.

Defendant submitted a supplemental letter brief and argued the trial court violated his constitutional rights to due process and equal protection because he was convicted by a plea and not after a trial, and the court denied his petition without considering new evidence of actual innocence.

We review the record and defendant's arguments, and affirm the trial court's denial of his petition.

---

[1]    All further statutory citations are to the Penal Code unless otherwise indicated.

[2]    Defendant filed his petition in 2022 under former section 1170.95, which was renumbered as section 1172.6, without substantive change on June 30, 2022. (*People v. Saibu* (2022) 81 Cal.App.5th 709, 714.) We refer to the statute by its current number throughout this opinion unless otherwise indicated.

2.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

On June 27, 1994, Gregorio Vello (Vello) was fatally shot in the parking lot of a liquor store on South Elm Avenue in Fresno.[4]

On July 25, 1994, defendant was charged by complaint with the murder of Vello with a firearm enhancement. On August 22, 1994, the court conducted the preliminary hearing and held defendant to answer.

***The Information***

On August 31, 1994, an information was filed charging defendant with the murder of Vello on or about June 27, 1994 (§ 187, subd. (a); count 1), with personal use of a firearm (§ 12022.5, subd. (a)), and the special circumstance that the murder was committed while defendant was engaged in an attempted robbery (§ 190.2, subd. (a)(17)(i)); and attempted robbery of Vello (§§ 664/211/212.5, subd. (b); count 2), with personal use of a firearm (§ 12022.5, subd. (a)). No one else was charged with murdering Vello.

---

[3]    After notice to the parties and without objection, this court takes judicial notice of the records in defendant's direct appeal (*People v. DeShawn Lee Jackson* (May 14, 1996, F024082) [nonpub. opn.]), and in a petition for writ of habeas corpus (*In re DeShawn Lee Jackson* (Feb. 5, 2014, F068515) [nonpub. opn.]).

The following factual and procedural summary is from the clerk's and reporter's transcripts from his trial as contained in his direct appeal, and the record of this appeal.

[4]    The victim's last name appears as both "Vello" and "Bello" in the records of his trial and the current appeal. The autopsy report and death certificate use "Vello," which we use in this case.

**DEFENDANT'S WAIVER OF A JURY TRIAL
AND AGREEMENT TO A BENCH TRIAL[5]**

On November 28, 1994, the court convened a hearing in defendant's case. Defendant was present with his attorney. The court stated the parties had discussed the case, and directed them to formalize their agreement.

> "[THE PROSECUTOR]: Your Honor, at this time, for the purposes of these proceedings, the People would be moving to strike the special circumstances alleged and also to move to dismiss Count Two, which is attempted robbery. The People would be further agreeing to limit the defendant's exposure on a violation of Section 187 to a second degree. And also, the personal use of a firearm is also reserved.
>
> "THE COURT: And that is on a condition, I believe.
>
> "[THE PROSECUTOR]: That is on the condition that the defendant waive his right to a jury trial, agree to the submission of the police reports, the Court's consideration of that, however, not giving up his rights to present his witnesses if he chooses to do so."

The court asked defense counsel if she agreed with the prosecutor's statement and that was "something that you are recommending to your client?" Defense counsel said yes.

The court stated defendant was 17 years old, he was found unfit for juvenile court, and he was bound over for trial as an adult. The court explained the bench trial agreement to defendant, and he said he understood and agreed.

The court explained to defendant, in great detail, that he had the right to a jury trial, that he was waiving a jury trial, and that the court would act as the jury to determine his guilt at a bench trial. Defendant said he understood, and waived his right to a jury trial.

---

**5**     In letter brief in this *Wende* appeal, defendant repeatedly insists that he pleaded guilty to murder and he did not have a trial, and his petition should have been granted because of his alleged plea. We recite the entirety of the procedural background in order to address defendant's claims in his letter brief.

The court explained the nature of the bench trial that the parties were going to agree to:

"THE COURT: [Y]ou need to know at the very outset that if you and your attorney and the District Attorney says, 'Okay, Judge, you can consider these [police] reports as evidence in this case,' then in all likelihood, after [finishing] reading them—I've only read halfway through them—if the attorneys say that these are pretty damning reports, in other words, that they are reports that I believe will show that a murder was committed and that you've been identified as the person who committed that murder, and so in all probability, if that is all there is to it, you're probably convicted. [¶] So this is—this is sort of like a—it's sort of harsher than a full-blown trial where we have witnesses. So you have to know that. In other words, it's much riskier what you're doing now, although, I understand you have a defense to present. I'll certainly listen to the defense and see if that raises a reasonable doubt in my mind as to your guilt. You need to know that things are not looking good for you right now. [¶] Okay, are you with me?

"THE DEFENDANT: Yes."

The court next explained to defendant his constitutional rights to confront and cross-examine witnesses, and he was giving up that right; he had the right to call his own witnesses in the defense case, which his counsel intended to do; and he had the right to remain silent. Defendant said he understood.

"THE COURT: …Nobody can require that you testify. Part of the record here, as I can understand it, is a discussion that you and [Detective] Stokes had. I believe from what I've seen of it, it looks like you have largely denied any involvement in this crime. But you talk about a lot of things, and I don't know how that is going to affect your defense in this case. It may or it may not."

Defendant said he understood and did not have any questions.

"THE COURT: Okay. So if we do what the attorneys suggest that we do, we won't have a jury, you won't see the witnesses that are called to testify against you, because they will all be here on paper, and the only witnesses that we'll see will be the witnesses that you call on your own defense, on the alibi, I guess, the identification issue, and then any witnesses the District Attorney calls with respect to your defense. In other words, if they have witnesses and they know that those witnesses are not telling the truth,

or whatever he has to say, we'll hear that last. So it will only be their partial testimony. [¶] Is that the way you understand it?

"THE DEFENDANT: Yes."

The court again asked defendant if he understood and waived his right to a jury trial, and to confront and cross-examine the prosecution's witnesses. Defendant said yes, and defense counsel concurred with his waivers.

The court marked the police reports as the prosecution's Exhibit No. 1 and accepted them into evidence.

"THE COURT: [L]et me make sure you understand. If we were to stop right at this point and you said, 'I have no evidence to present, Judge,' probably these reports would make a sufficient case against you to find you guilty. You understand that?

"THE DEFENDANT: Yes."

The court asked defendant if anyone forced or coerced him into agreeing to the bench trial, and defendant said no. The court asked if he felt comfortable that this was the best decision for him, and defendant said yes.

The court found defendant knowingly and intelligently waived his rights to a jury trial and confront and cross-examine witnesses.[6] The court directed the parties to give their opening statements in the bench trial.

## DEFENDANT'S BENCH TRIAL

### *Opening Statements*

The prosecutor stated that Vello, who was 22 years old, was pushing his bicycle to a liquor store on South Elm Avenue in Fresno, when defendant confronted him. A witness was standing by the payphone, and stated defendant pulled a gun and fired one

---

[6] On November 29, 1994, the second day of the bench trial, the court stated that it needed to advise defendant about another issue. The court explained that in addition to the murder charge, the information alleged that defendant personally used a firearm, and defendant's jury waiver also applied to the firearm enhancement. The court asked defendant if this changed his mind about his waiver of a jury trial, defendant said no, and he again waived his right to a jury trial.

6.

shot at Vello. The liquor store's clerk heard the gunshot, ran outside, and saw defendant running away. Both of these individuals identified defendant from photographic lineups. The prosecutor also outlined other evidence that implicated defendant as the gunman.

Defense counsel stated the defense would present five witnesses who would testify about defendant's alibi and prove he was not present at the time and place of the shooting.

### The Prosecution's Case

Based on a stipulation between the parties, the entirety of the prosecution's case at defendant's bench trial consisted of the court's review of police reports about the homicide and investigation. The court considered the following evidence in these reports.

### The Crime Scene

At 8:14 p.m. on Monday, June 27, 1994, the police received a call about a shooting at a liquor store on South Elm Avenue in Fresno. At 8:16 p.m., Officers Maguire and Madden arrived at the scene. They found Vello lying on the ground in the store's parking lot, and he had a gunshot wound in his chest. Vello was wearing headphones from a portable radio. A yellow 10-speed bicycle was on the ground, about five feet away from Vello. An expended .32-caliber casing was two feet from the bicycle.

The bicycle was subsequently processed for fingerprints, and only Vello's prints were found on it.

### Initial Interviews with the Store Clerks

The officers interviewed E.W. and E.T., who were working inside the liquor store at the time of the shooting. E.W. said he heard a gunshot, ran outside, and saw the victim lying in the liquor store's parking lot. E.W. saw a Black male, approximately 18 years old, run away from the liquor store and head east towards Poppy Avenue. E.W. did not see this person's face.

7.

E.T. said he also heard the gunshot, ran outside, and saw the victim lying on the ground. E.T. said he saw a Black male running from the parking lot, heading east across South Elm toward Poppy. E.T. said he saw this person's face and would be able to identify him if he had the opportunity.

### *Initial Interview with Witness M.J.*

The officers interviewed witness M.J. at the scene. M.J. said he was using the payphone located outside, in front of the liquor store, when the incident occurred. He saw a Hispanic male, later identified as Vello, walking and pushing a yellow bicycle toward the liquor store entrance.

M.J. said he saw two Black males walking on the sidewalk next to the liquor store. One of the men immediately started to grab at Vello's bicycle, and Vello did not let go of it. This same man told Vello to let it go. Vello held onto the bicycle and said something in Spanish. M.J. said at that point, this same man used his left hand to pull out a small black pistol. The gunman held the pistol about one foot away from Vello and, after a moment, fired one shot into Vello's chest. Vello fell to the ground. The gunman ran away from the liquor store, and headed east across South Elm and towards Poppy.

M.J. said the second man had stayed outside the liquor store and near the payphone, as a "lookout" during the gunman's confrontation with Vello. A short time after the gunman fled, the second man also left the parking lot and walked across South Elm, heading east towards Poppy.

M.J. described the gunman as approximately 18 years old. M.J. said he could identify the gunman and had seen him before. M.J. believed the gunman's name was "Deshawn" and thought he lived in the area of Florence and Poppy. M.J. said he had also seen the second man before, could identify him, and thought that man's name was "Derrick."

*The Victim*

Vello was taken to the hospital and died during emergency surgery. The autopsy showed a single bullet entered the front of his chest and pierced his heart in two places. A .32-caliber bullet was recovered from his body.

Detective Stokes, who attended the autopsy, reported there was no evidence on Vello's body that "there was a struggle in which [Vello] was struck or struck anyone. This was observed in that there were no wounds or lacerations or bruises to the victim's hands, arms or face, indicating a fight."

The autopsy report stated there were no wounds or abrasions on Vellos's arms or hands, but fingernail scrapings were taken from under his fingernails and preserved.

A friend of Vello's later contacted the police department and said he and Vello had been at a park that day. Vello left to buy cold drinks from the liquor store and never returned.

*Second Interview with E.W.*

On June 28, 1994, Detective Stokes interviewed E.W., the liquor store clerk, while he was at work. E.W. said he was inside the liquor store when he heard the gunshot. He went to the front of the store and looked outside, and saw a Black male run east across South Elm, toward the business across the street.

E.W. said that later, on the night of the shooting, Ronnie Armstrong appeared at the liquor store about an hour after the police ended their investigation at the scene. Armstrong walked around outside of the liquor store, and made statements about his friends being involved in the murder. E.W. believed Armstrong and his friends lived together on Poppy. E.W. thought the gunman's name was " 'Deshane.' "

*Interview with the Jane Doe*

Detective Stokes interviewed Jane Doe, who worked at the business across the street from the liquor store. Doe said she heard a gunshot and saw a Black male run

9.

away from the liquor store, cross the center divider on South Elm, and continue running through another parking lot.

Jane Doe was shown a six-person photographic lineup that contained defendant's photograph. She said the suspect's picture was in the lineup, but she would not identify him because she feared for her safety. Jane Doe was later shown a second lineup that contained defendant's photograph with five different subjects. Jane Doe said the suspect was in the lineup and refused to identify him because she feared for her safety.

**Second Interview with M.J.**

On the evening of June 28, 1994, Detective Stokes interviewed M.J., who said he saw Vello "just pushing his bike when those two guys tried to steal it from him and they shot him for no real reason." M.J. said he had previously seen the gunman on more than one occasion around the liquor store, and he was willing to identify this person because what he did "was too far out."

Detective Stokes presented a photographic lineup to M.J., who immediately pointed to defendant's photograph and stated that, "without any doubt," defendant was the person who shot Vello "for no reason." Stokes showed M.J. a photograph of Ronnie Armstrong. M.J. said Armstrong was not the second suspect who was with defendant, but he had seen Armstrong around the liquor store on other occasions.

**Defendant's Arrest and Interview**

On July 1, 1994, E.W. called the police and reported defendant and Ronnie Armstrong had just been in the liquor store. When officers arrived at the store, defendant ran away but he was eventually taken into custody. He initially identified himself as "Gary Smith," then gave his true name.

Defendant was advised of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, and said he would answer questions. Detective Stokes asked if he understood that he was under arrest for the murder at the liquor store. Defendant said he understood, but he was not involved. Defendant said his grandmother drove him by the

10.

liquor store later on the evening of the shooting, when the police were getting ready to leave.

Detective Stokes asked defendant if he could remember exactly what he had done on the day of the shooting. Defendant said he was home most of the day. At 7:00 p.m., he went to see his sister and her boyfriend at their home, which was around the corner from where he lived with his mother. Defendant stayed at his sister's place for about an hour.

> "[Defendant] continued by stating that he had stayed at his sister's house for approximately an hour and at around 2000 hours [8:00 p.m.], he was picked up by his grandmother, [E.C.], and that [E.C.] took him and his sister and her boyfriend …, along with [a child], over to his grandmother's apartment [in Fresno]. He then told me that the apartment was on Lee Street, he believed, and it was a rest home. He then mentioned that his 'auntie,' as he referred to her, Monica Howard, could verify that he had spent a good portion of the evening at the rest home. He stated that Monica worked at the location and that he had spoken to her when he arrived with his sister. He then told me that he had stayed at this location until his grandmother took him back to his house on Rose. He mentioned that his mother had gone to the hospital that night with some pains in her chest and that it was some time later when she had returned from the hospital and everything was okay, but that he was at home at that time."[7]

Detective Stokes asked defendant if he knew Ronnie Armstrong. Defendant said no. Stokes asked if he knew anyone who lived in an apartment complex in the area of Poppy and Florence, and defendant said no.

Stokes asked defendant if he had fired any guns in the last few days. Defendant said no, except for a BB gun. Stokes mentioned that gunshot residue could remain on his hands for up to two weeks. Defendant then said he fired some shotguns approximately three to four weeks earlier.

Defendant then said "he didn't think it made much sense" for him to go back to the liquor store on the night of the shooting if he was involved in the murder. Stokes

---

[7] E.C. lived at an apartment complex on Lorena Street.

11.

asked who he had been with before he was arrested. Defendant said he was with his 15-year-old cousin. Stokes asked defendant why he ran away when the police arrived, and left his cousin behind. Defendant said he didn't do that, he just walked through the field and his cousin was going to catch up with him. Stokes asked where his cousin lived and defendant said he wasn't sure.

Stokes told defendant that he was positively identified by more than one person who saw him commit the homicide. Stokes asked more questions about his association with Armstrong, and showed him a photograph of Armstrong. Defendant repeatedly denied knowing him. After more questions about Armstrong, defendant said he knew Armstrong's sister, who lived in an apartment near Poppy and Florence. Stokes asked why he denied knowing Armstrong. Defendant said he knew Armstrong's sister but said that Armstrong " 'isn't my partner.' "

Defendant said: " 'If I did it, why go back at [10:30] that night? I'm not a fool.' " Stokes asked what he meant. Defendant said he went to the liquor store later on the night of the shooting and knew E.W., the store clerk, saw him. Defendant said it did not make any sense that he would go back to the crime scene just hours after the shooting occurred.

***Second Interview with E.T.***

On August 4, 1994, Detective Stokes met with E.T., the other liquor store clerk. Stokes showed him a photographic lineup, and E.T. pointed to defendant's picture and said, "this was the suspect that [I] had in mind." E.T. said this person's name was "Deshawn" and he regularly visited the store. E.T. said he could not be 100 percent certain that defendant was the gunman because he did not see the suspect "face to face." E.T. stated that when he heard the gunshot and ran into the parking lot, he saw the suspect running away. He said the suspect looked back "somewhat toward the scene," and E.T. was able to "see somewhat of the profile of the suspect's face and he saw the general height and build of the suspect." E.T. said he immediately got the impression

12.

that the suspect running away was the person he knew as "Deshawn," based on the profile of the suspect's face, and his general height, build, and complexion.

*Interview with W.E.*

On August 5, 1994, Detective Stokes interviewed W.E. Stokes advised that he was going to show her a photographic lineup to see if she could identify the shooting suspect. W.E. immediately replied that she would be able to pick out the suspect because the suspect associated with her son and other young men in the neighborhood. The suspect also hung around an apartment complex near her own residence. W.E. looked at the lineup and immediately pointed to defendant's photograph.

W.E. said that on the day of the homicide, she was walking to the store and stopped at the corner of Lorena and Poppy. She was about to cross the street going west, when she saw defendant run away from the South Elm area. He ran east on Lorena and then southeast on Poppy. She assumed he was running to the apartment complex where she knew he hung out. When she crossed the street, she saw a big commotion at the liquor store.

## DEFENSE WITNESSES

The defense called five witnesses who testified in person at the bench trial.

*Defendant's Mother*

Defendant's mother C.J. testified that defendant lived with her on South Rose Avenue. C.J.'s mother E.C. lived in an apartment on Lorena Avenue.

C.J. testified that at 4:30 p.m. on June 27, 1994, she went home from work because she felt sick and her chest was hurting. Defendant was at their house and asleep. She woke him up and told him that her chest was hurting.

At some point after 4:30 p.m., defendant left their house and said he was going to see his sister and her boyfriend at their nearby house.

C.J. said she next saw defendant when she went to E.C.'s apartment on Lorena, between 8:30 p.m. and 8:45 p.m. She went to E.C.'s apartment because she needed to

13.

make a call and didn't have a telephone.  When C.J. arrived at her mother's apartment complex, E.C. wasn't home.  C.J. spoke to Monica Howard, the apartment complex's security guard, and asked for the key to E.C.'s apartment.  They tried the key but it didn't work because E.C. had changed her lock.  C.J. went back to Howard and asked to use her phone to make a collect call to her sister.  Howard agreed, and C.J. made the call and talked to her sister for about 20 minutes.

C.J. testified that just as she finished her call, E.C. drove up to the apartment complex with defendant, and his sister and her boyfriend in her car.  Everyone went to E.C.'s apartment.

C.J. told defendant that she was not feeling well and had to go to the hospital, but didn't mention which hospital.  C.J. left her mother's apartment around 9:00 p.m., and went directly to Community Hospital's emergency department.  C.J. had to wait over an hour to be seen, she was evaluated for another 45 minutes, and she was ultimately released.  C.J. went back to her house and defendant was there.  E.C. arrived at the house to check on her, and C.J. went to bed around 12:30 a.m.

C.J. testified that when she gave her initial statement to Detective Stokes, she was upset because she had just learned defendant was arrested for murder.

*Monica Howard*

Howard testified that defendant's grandmother, E.C., was her godmother.  She had known defendant and his family for many years, and defendant referred to her as "auntie."  Howard worked as an office clerk and security guard at the apartment complex where defendant's grandmother E.C. lived.  Howard's duties included helping the senior citizen residents if they were sick or needed assistance.

Howard testified that on Sunday, June 26, 1994, the day before the shooting, E.C. returned to her apartment from Arizona.  When she arrived, Howard gave her a message from her son, that he was in jail.

14.

The next day, Monday, June 27, 1994, Howard was at her own home, which was across the street from where defendant's sister lived with her boyfriend. Around 7:00 p.m., she saw E.C., defendant, and defendant's sister and her boyfriend at defendant's sister's house across the street. Howard testified E.C. was moving defendant's sister and her boyfriend to live in her son's apartment while he was in jail.

Howard testified that sometime around 8:30 p.m., she was in her office at the apartment complex. C.J. arrived and asked Howard for the key to E.C.'s apartment, because E.C. wasn't there and she needed to use the telephone. Howard gave her the key but it didn't work, so Howard let C.J. use the telephone in her office. About 10 minutes later, E.C. drove back to her apartment with defendant, and his sister and her boyfriend. E.C. said her kids were driving her crazy "moving back and forth" between the Clovis and Fresno homes.

Howard testified that about five minutes later, C.J. came to her office and said she was going to the hospital because she had chest pains. Howard asked if anyone was going with her. C.J. said no, they were busy doing their own thing, and she left. About 10 minutes later, E.C. left her apartment with defendant, his sister and her boyfriend, and said she was taking them to her son's apartment in Clovis, and then she would go to the hospital to check on C.J. Howard didn't see defendant again that night.

### Defendant's Grandmother

Defendant's grandmother E.C. testified she went to Arizona in June 1994, and she returned to Fresno on Sunday, June 26, 1994. When she arrived at her apartment, Howard gave her the message that her son was in jail. E.C. also received a message from her son's apartment manager in Clovis, that something smelled inside his apartment.

On Monday, June 27, 1994, E.C. drove three times between her residence in Fresno and her son's apartment in Clovis. Her first trip was in the morning, and she took defendant's sister and her boyfriend to clean out the refrigerator in her son's apartment because the electricity had been turned off. She left them there and went to work.

15.

Sometime after 5:00 p.m., she drove back to Clovis, picked up defendant's sister and her boyfriend, and drove back to her home in Fresno. Defendant was waiting there. Defendant asked if his sister was going to stay overnight at the Clovis apartment, and E.C. said yes. Defendant said he would go back to Clovis with them.

E.C. testified she drove to C.J.'s home but C.J. wasn't there. E.C. drove everyone back to her own apartment in Fresno, found C.J. in the office, and defendant and the others went inside E.C.'s apartment. C.J. complained of chest pains and went outside with defendant. C.J. left and defendant stayed at E.C.'s apartment. E.C. testified she was going to drive defendant, and his sister and her boyfriend, back to Clovis, but they stopped at the house where the sister lived to get something. Defendant said he was going to stay in Fresno because his mother went to the hospital. E.C. drove defendant back to his own house and left him there.

E.C. took defendant's sister and her boyfriend back to Clovis, then went to Valley Medical Center to check on her daughter. She discovered C.J. was at another hospital, went there, and learned she had been discharged. E.C. went to C.J.'s house, and defendant was there with his mother.

On further questioning, E.C. testified she drove defendant to the apartment in Clovis on her second trip, after the sun went down. She denied that when she initially spoke to Detective Stokes, she agreed that it was possible defendant could have been at the liquor store at 8:15 p.m.

*Apartment Managers*

T.A. and D.A. were the managers of the apartment complex in Clovis where E.C.'s son lived. On Monday, June 27, 1994, E.C. arrived at that apartment complex with defendant's sister and her boyfriend. E.C. told the managers that her son was in custody, and asked for the key to investigate the smell coming from his apartment. They discovered his power had been turned off and food had spoiled. E.C. and her family threw away the food. E.C. asked if defendant's sister and her boyfriend could stay at the

16.

apartment to watch her son's property, and D.A. approved. E.C. said they were going to bring some of their things over, and they left Clovis.

D.A. testified that around 5:00 p.m., she saw defendant hanging around the apartment complex in Clovis. She next saw him at 7:00 p.m., and did not see him again that night.

T.A. testified he first saw defendant at the complex between 5:00 p.m. and 6:00 p.m. He last saw defendant between 9:30 p.m. to 10:00 p.m. He believed he also saw defendant sometime between the first and last sightings.

## REBUTTAL EVIDENCE

The prosecutor called Detective Stokes to testify in person as a rebuttal witness. Stokes testified that on July 1, 1994, he went to defendant's home on South Rose Avenue to inform defendant's family that he had been arrested for murder. C.J., E.C., and Monica Howard were there. The house was less than one mile from the liquor store.

Stokes testified he asked them about defendant's whereabouts on the day of the shooting. C.J. initially said she saw him at 4:00 p.m., and then again at 10:00 p.m. or 10:30 p.m. E.C. said she dropped off defendant in the alley behind the South Rose house, when it was definitely light outside but the sun was low in the sky. Stokes asked if this time span would have been between 7:30 p.m. and 8:00 p.m. E.C. said that would be about right but she wasn't sure.[8]

Stokes testified E.C. said she made a number of trips between her apartment in Fresno and her son's apartment in Clovis, and defendant was with her on one trip. She thought that she picked up defendant around 4:00 p.m. or 4:30 p.m. and drove to Clovis, but Stokes testified her story became confusing as she tried to relate the times.

---

[8]     The prosecution introduced into evidence a weather report that showed sunset occurred at 8:22 p.m. on June 27, 1994, and the homicide occurred at approximately 8:15 p.m.

17.

Stokes testified that after he took their statements, he informed defendant's mother and grandmother that the homicide occurred at the liquor store at approximately 8:15 p.m. In response, E.C. "made a statement that she thought that it was closer to 8 o'clock that [defendant] had been dropped off. And I said something about, well, that still left this window of time, and without any other explanation. And she said—both of them acknowledged that" there was a window where defendant could have been at the liquor store. E.C. thought it was closer to 8:00 p.m. when she dropped off defendant, and "not closer to 7:30, but definitely closer to 8 o'clock."

Detective Stokes testified he later spoke to Monica Howard, who said that on the night of the shooting, she saw defendant at E.C.'s apartment around 9:00 p.m.

**Verdict and Sentence**

After hearing and considering the evidence introduced at the bench trial on November 28 and 29, 1994, the court took the matter under submission.

On November 30, 1994, the trial court found appellant guilty of second degree murder and that he personally used a gun in the commission of the offense. The court stated it reached this verdict after reviewing the police reports introduced as Exhibit 1, and the testimony of witnesses who appeared in court. The court stated the police reports also contained inadmissible information, and it had disregarded references to statements given by anonymous sources.

On June 29, 1995, the court sentenced defendant to 15 years to life for murder plus four years for the firearm enhancement. The court found defendant was not amenable for treatment and training at the California Youth Authority (CYA), but recommended initial housing of defendant at CYA.

# POSTJUDGMENT PROCEEDINGS

## Direct Appeal

In defendant's direct appeal, appellate counsel filed a *Wende* brief, and defendant did not file a letter brief. On May 14, 1996, this court filed the nonpublished opinion that affirmed the judgment. (*People v. Jackson* (May 14, 1996, F024082) [nonpub. opn.].)

## Defendant's Writ Petitions[9]

In 1997, defendant filed a petition for writ of habeas corpus in the trial court and alleged ineffective assistance of appellate counsel for filing the *Wende* brief in his direct appeal. The trial court denied this writ. (See *In re DeShawn Jackson*, *supra*, F068515; Exhibit A.)

In 2007, defendant filed a writ petition in the trial court and claimed the court failed to adequately explain his waiver of his constitutional rights prior to his trial, and attached the reporter's transcripts from his trial in support of the petition. The court denied the writ, and held the reporter's transcripts from defendant's trial "show that the trial court did advise [defendant] that he was waiving his right to a jury trial. The transcripts also show that [defendant] sufficiently understood that he was waiving his rights." (*In re DeShawn Jackson*, *supra*, F068515; Exhibit C.) A writ raising the same issue was denied by the California Supreme Court. (*In re DeShawn Jackson*, *supra*, F068515; Exhibit D.)

## Writ Petitions Based on DNA Evidence

On October 21, 2013, defendant filed a petition for writ of habeas corpus in the trial court, and alleged there was newly discovered evidence of his innocence because the scrapings taken from under the victim's fingernails during the autopsy in 1998, were

---

[9] As explained above, after notice to the parties and without objection, this court takes judicial notice of the records in defendant's petition for writ of habeas corpus (*In re DeShawn Lee Jackson* (Feb. 5, 2014, F068515) [nonpub. opn.]), which includes documentary exhibits consisting of his prior petitions.

tested for DNA in 2012, the tests showed the scrapings did not include defendant's DNA, and the DNA tests undermined the validity of his murder conviction. (*In re DeShawn Jackson*, *supra*, F068515; Exhibit E.)

On November 14, 2013, the trial court denied defendant's writ petition and held "that the absence of [defendant's] DNA in the right hand fingernail scrapings of the victim does not 'point unerringly to innocence or reduced culpability.' [Citation.] The fact that [defendant's] DNA was not underneath the fingernails of the victim's right hand does not demonstrate [he] is innocent of his [murder] conviction." (*In re DeShawn Jackson*, *supra*, F068515; Exhibit E.)

On December 13, 2013, defendant filed a writ petition in this court, and again alleged there was newly-discovered evidence of his actual innocence based on the results of DNA tests conducted on the scrapings taken from underneath the victim's fingernails. Defendant argued the DNA tests undermined "key witness statements" from people who identified defendant "as the perpetrator who grabbed victim[']s bike and … shot him in the chest." (*In re DeShawn Jackson*, *supra*, F068515; writ petition.) Defendant claimed that when M.J. spoke to the police, he said there was a struggle between the victim and the perpetrator over the bicycle, and the absence of defendant's DNA under the victim's fingernails established his actual innocence. (*In re DeShawn Jackson*, *supra*, F068515; Exhibit E.)

Defendant filed supporting exhibits that included the 2012 report from the DNA tests. (*In re DeShawn Jackson*, *supra*, F068515; Exhibit G.) He also attached a letter from a defense attorney to defendant in 2012, explaining that the DNA evidence would only be relevant "if we can establish that there was a struggle for the bicycle," and the attorney had been unable to locate M.J., the witness who was in the liquor store's parking lot. (*In re DeShawn Jackson*, *supra*, F068515; Exhibit I.) In 2013, the same attorney sent to defendant a transcript of his investigator's interview with M.J., and the attorney advised defendant that M.J.'s statements did not help his case. (*In re DeShawn Jackson*,

*supra*, F068515; Exhibit J.) In the interview, M.J. stated he "saw a young black male approaching a Hispanic male walking with a bicycle. [¶] [M.J.] stated that as the young black male approached the Hispanic male he heard the Hispanic male yelling for the young black male not to take his bicycle. [M.J.] stated that he did not see either male come in contact with the other male before the black male took one step back, pulled a gun out and shot the Hispanic male…. [M.J.] stated that he is confident that the right individual is in prison for the shooting." (*In re DeShawn Jackson*, *supra*, F068515; Exhibit K.)

On February 5, 2014, this court denied defendant's writ petition without comment.

## DEFENDANT'S PETITION FOR RESENTENCING

On August 12, 2022, defendant filed a petition for resentencing pursuant to section 1172.6, and requested appointment of counsel.

Defendant filed a supporting declaration that consisted of a preprinted form where he checked boxes that asserted he was eligible for resentencing because a complaint, information, or indictment was filed that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine; he was convicted of murder, attempted murder, or manslaughter following a trial, or accepted a plea offer in lieu of a trial in which he could have been convicted of murder or attempted murder; and he could not presently be convicted of murder or attempted murder because of changes made to section 188 and 189, effective January 1, 2019.

On September 2, 2022, the court appointed counsel.

**Initial Hearings**

On September 30, 2022, the court convened a status hearing. Defense counsel waived defendant's presence. Counsel stated defendant was convicted after a bench trial,

there were no jury instructions to review, and it might take time to obtain the transcript from the bench trial.

The court gave a tentative ruling that defendant's petition failed to state a prima facie case because the section 12022.5 personal use enhancement was found true, "[b]ut more importantly it appears the defendant was the actual shooter during the offense."

On March 30, 2023, the court ordered for defendant to be transported for all further hearings on his petition.

**The Parties' Briefs on the Prima Facie Determination**

The prosecution filed an opposition to defendant's petition, cited the trial court's verdict from defendant's bench trial in 1994, and argued defendant failed to make a prima facie case because he was convicted as the actual killer and ineligible for resentencing. As a supporting exhibit, the prosecution filed a partial reporter's transcript from the bench trial.[10]

Defendant filed a reply brief and argued the trial court could not rely on factual findings from the bench trial to make the prima facie determination and an evidentiary hearing was required. As supporting exhibits, defendant filed the reports from the DNA tests, that the scrapings taken from under the victim's fingernails did not match defendant's DNA; and a declaration from M.J., dated January 8, 2020, that he told the police that the gunman "look[ed] like" defendant but he was not sure, and now he was no longer sure of the identification after learning about the DNA evidence.[11]

---

[10]    The prosecution also filed defendant's form petition for resentencing filed in 2020, pursuant to former section 1170.95, and the prosecution's opposition to that petition, arguing that defendant failed to make a prima facie case because he was convicted as the actual killer. The trial court obviously denied defendant's first petition, but the court's order is not in the record. Since we cannot determine the reasons for the denial, we will not reject defendant's second petition as an improper successive petition. (See, e.g., *People v. Farfan* (2021) 71 Cal.App.5th 942, 949–951.)

[11]    M.J.'s declaration is different from the statements he gave to the police in 1998 and a defense investigator in 2013, that he was sure defendant was the gunman.

**The Court's Issuance of the OSC**

On June 11, 2024, the court held a hearing on the prima facie determination, and noted that defendant was convicted of murder after a bench trial and there were no jury instructions. The court stated it could only make the prima facie determination if it considered the facts introduced at defendant's bench trial, and gave a tentative decision to issue an OSC and conduct an evidentiary hearing so the prosecutor could introduce the trial evidence about the nature of defendant's conviction.[12]

However, the court clarified that even if it conducted an evidentiary hearing on the petition, the parties were not going to retry the case and the court would not hear evidence on defendant's renewed claim of mistaken identity. The court stated that *People v. Palacios* (2024) 101 Cal.App.5th 942 (*Palacios*) "makes clear that the purpose of an 1172.6 hearing is not to relitigate trial errors," and the court "would confine its consideration as to whether or not there was [*sic*] sufficient facts to establish that [defendant] could be convicted under the current theory."

The court stated it would issue the OSC, but the evidentiary hearing would be "very limited" as to whether defendant was convicted of murder under a theory that was now invalid after the amendments to sections 188 and 189.

Defense counsel argued an evidentiary hearing was required because defendant "took a plea to avoid the felony murder rule" and the robbery special circumstance. Defense counsel said the police reports showed there were multiple suspects, and the eyewitnesses said two men tried to get the bicycle from the victim. The court said that *Palacios* "clarifies that we're not retrying … [the] sufficiency of the evidence."

---

[12] In *People v. Anaya* (2025) 117 Cal.App.5th 615, decided after the prima facie hearing in this case, the court held a trial court's findings at the conclusion of the defendant's bench trial could be relied on to make the prima facie finding under section 1172.6. (*Anaya, supra*, 117 Cal.App.5th at pp. 618–619, 621–622.)

The court requested the parties file briefs prior to the evidentiary hearing, and the prosecutor could file the police reports considered by the trial court at the bench trial. "[S]o the record is clear, I'm issuing the OSC today, finding that the defense has established prima facie eligibility under the statute, and therefore I am issuing the OSC back to the People to establish what we've already discussed."

**The Court's Continued Hearing on the Petition**

On September 26, 2024, the court convened another hearing on the petition. Defense counsel stated she intended to call three witnesses at the evidentiary hearing. The court stated:

> "I am in receipt of all of your pleadings, and my tentative, this is not a hearing to retry the guilt of the Defendant. And my observation of the documentation submitted by the Defense is it appears to go to identification and whether or not the identification at the time of the offense was supported by appropriate evidence to support the conviction. That's not an issue before the Court. So while I'm going to allow you to present witnesses, I'm just trying to frame the scope of the hearing. The scope of the hearing is essentially the theory upon which the defendant was convicted [of murder], and whether or not that theory was supported by the evidence. But if it's merely evidence going to the identification of the Defendant, I would entertain a motion to either strike or to not allow that testimony at the time of the hearing."

Defense counsel argued the prosecutor had the burden of proving beyond a reasonable doubt that defendant was the actual killer, and that meant evidence of the perpetrator's identity was relevant. The court disagreed:

> "This is not, and the case is made clear, this is not a retrial, this is not an opportunity to re-weigh the evidence. This is an opportunity as to whether or not the theory upon which the Defendant was convicted was one that is currently permissible under the restated law. So in the broad scheme of things, was there a theory of natural and probable consequences. Was there a theory that would have allowed the jury to convict the defendant without establishing he was the actual killer or acted, aided and abetted with a specific intent to kill, or was involved in, and I'm going to lose the third theory, but it doesn't appear to be at play here in any case.

24.

"So I understand your concern that at the trial there may have been an argument that there was insufficient evidence to overcome his alibi defense. In other words, he wasn't the one who pulled the trigger. That's not the issue before the Court, because there's no theory before the Court that, in fact, he acted, whoever the killer was, acted with the intent to kill. The evidence supporting who the killer is, is not a subject of a [section] 1172.6 [petition] here. [¶] You are looking at me like I'm crazy."

Defense counsel replied that defendant had just turned 17 years old when he "agreed to a very strange bench trial." The court replied that such issues "could have been litigated 20 years ago, that could have been taken on a writ, could have been taken on appeal," and they were not legitimate issues given the narrow focus of a section 1172.6 petition. Defense counsel replied "the narrow focus of 1172.6 is to put the blame on the person that actually pulled the trigger" and there was evidence to show defendant was not the actual killer.

The court again disagreed, and stated that section 1172.6 addressed "what was the theory of conviction of the Defendant, what was the theory?" The court had already reviewed the transcript of defendant's bench trial, the judge was very careful to consider all the evidence, and the judge found beyond a reasonable doubt that defendant was guilty of murder as the actual killer. "Now, whether or not there was evidence to support that judge's opinion should have been attacked at a prior time," and identity was not the focus of a section 1172.6 petition.

The prosecution argued a petition for a writ of habeas corpus was the appropriate procedure for defendant to claim there was newly discovered evidence of innocence. The section 1172.6 hearing was not "the correct vehicle to present issues of identity" because "this is not a new trial, it's an act of leniency by the Court with respect to the one area of whether or not malice was imputed to the Defendant."

The court concurred:

"[M]y review of all the current 1172.6 cases, mandate or dictate the decision before the court is the theory of conviction. So hypothetically, if the evidence in this case would have been that [defendant] and another

25.

person acting, and based on their actions, the victim was killed, and that [defendant] was prosecuted under a theory of aiding and abetting the other person, or [defendant] was prosecuted under felony murder theory of natural and probable consequences based upon the actions of the other person, we might have an 1172.6 issue to at least litigate. But there was no evidence at all that there was a second actor in this case, or no theory of prosecution that anybody other than [defendant] was the actor who caused the death."

Defense counsel asserted "there were two people present" at the time of the attempted robbery and murder, and the police stopped looking for the second person. Counsel stated the second person was likely Derrick Armstrong, a relative of Ronnie Armstrong, who bragged about the crime. Counsel stated defendant presented five alibi witnesses at the bench trial, and they had no reason to lie. The court said there was no evidence that two people committed the murder together.

Defense counsel again complained that the police stopped looking for the second suspect, the defense now had DNA that completely exonerated defendant, and defendant filed a writ based on the DNA evidence but it was "thrown out" as untimely in 2012.[13] Counsel intended to argue at the section 1172.6 evidentiary hearing that defendant was the second suspect and he did not commit the murder.

The court responded: "[I]f that is the claim of the Defense, then you are correct, I will not allow that." Defense counsel acknowledged she had to argue that defendant was the "second person, and not the first person, and that he wasn't a major person and he didn't act without reverence for human life, and he didn't contemplate the natural consequences of the actions of trying to steal a bicycle. But yeah, I mean I get that I have work to do."

---

[13] As stated above, the trial court denied defendant's writ petition in 2013, and found "the absence of [defendant's] DNA in the right hand fingernail scrapings of the victim does not 'point unerringly to innocence or reduced culpability.' [Citation.] The fact that [defendant's] DNA was not underneath the fingernails of the victim's right hand does not demonstrate [he] is innocent of his [murder] conviction." (*In re DeShawn Jackson*, *supra*, F068515; Exhibit E.)

Defense counsel added that if defendant had a jury trial instead of a bench trial, "probably no instruction of felony murder theory would have gone through." The court said: "[T]here was no theory that I, the Court was able to develop, other than the allegation was [defendant] was the direct actual only killer that acted with specific intent to kill." The court again explained it was not foreclosing defendant from seeking other remedies, but these issues were not relevant at the section 1172.6 evidentiary hearing.

**The Parties' Briefs for the Evidentiary Hearing**

The prosecutor filed an evidentiary hearing brief, and argued the evidence from the bench trial proved beyond a reasonable doubt that defendant was convicted as the actual killer, and he was ineligible for resentencing. As supporting exhibits, the prosecution attached the entirety of the reporter's transcript from the bench trial and the police reports introduced at the bench trial pursuant to the parties' stipulation.

Defense counsel argued the allegations in the information showed the People's intent to prosecute defendant on a felony murder theory, and again claimed he was convicted because he entered a "plea" and did not have a full trial, that he "took a deal that removed first degree murder and robbery from the charges to avoid prosecution under a theory of felony murder or natural and probable consequences," and his "plea deal" removed the prosecution's possible reliance on the felony murder rule and/or the natural and probable consequences doctrine. Defendant argued the prosecution had the burden to prove beyond a reasonable doubt that he was guilty of murder, which permitted the defense to introduce evidence challenging his identification as the gunman.

## THE EVIDENTIARY HEARING

On October 28, 2024, the court convened the evidentiary hearing, and said it had already found defendant's petition stated a prima facie case for relief under section 1172.6. The court again said it was only going to consider whether defendant was still guilty of murder after the amendments to sections 188 and 189 on the felony-murder rule

and the natural and probable consequences doctrine and it would not consider defendant's mistaken identity arguments.

***The Parties' Arguments***

The court asked the parties to make offers of proof for the hearing. Defense counsel stated defendant "took" a plea to avoid the felony-murder rule. The court replied defendant had a bench trial and did not enter a plea. Defense counsel said it was a "partial plea" and "more like a plea" than a trial, and defendant was charged under the felony-murder rule because the information also alleged a robbery special circumstance. Counsel asserted defendant was allowed to introduce evidence to prove he was not the gunman, and the police stopped looking for the second suspect.

The court again stated defendant was trying to challenge the sufficiency of the evidence that he was the gunman, which was not relevant for a section 1172.6 hearing. The court had reviewed the transcript of the bench trial, where the prosecution introduced evidence that defendant was the gunman and defendant called alibi witnesses. Defense counsel again insisted there was never a trial. The court replied that defendant waived his right to a jury trial at the beginning of the trial proceedings and agreed to the bench trial. Defense counsel replied there was an impermissible shifting of the burden of proof to the defendant to prove he was not the gunman.

Defense counsel stated that at the evidentiary hearing, she would call an expert who would testify about a young person's psychological state, and the evidence was "more pertinent to resentencing than to guilt or innocence." The defense would also call an expert to testify about "the inadmissibility of the photo lineup" and "other failures of police procedure" during the homicide investigation, and the DNA evidence that allegedly exonerated him. Counsel also intended to call an expert to address the Racial Justice Act.

The court again said defense counsel could not challenge the sufficiency of the evidence about whether defendant was the actual shooter, and the focus of the section

28.

1172.6 evidentiary hearing was limited to whether defendant was convicted of murder under a theory that was now invalid. The court stated the defense wanted to show that if defendant was retried today, the prosecution could not prove he was the actual shooter, "which by definition would mean somebody else was the shooter, not a natural and probable consequences theory … just that they got the wrong guy." Defense counsel claimed defendant "took a plea" to avoid prosecution under the natural and probable consequences doctrine.

The court overruled defense counsel's arguments and held that defendant had a bench trial where the prosecution was required to prove beyond a reasonable doubt, to the court as the finder of fact, that defendant was the gunman, defendant introduced alibi evidence, and the court found him guilty of murder as the actual killer.

The prosecutor argued defendant should file a habeas petition to raise new evidence to challenge identity. The prosecutor acknowledged the possibility that defendant could have been charged under the felony-murder rule based on the special circumstance, but that only showed that the record did not establish a prima facie case and an evidentiary hearing was required. The prosecutor explained that even if the felony-murder rule had been relied on, defendant was still guilty of murder if he was the actual killer after the amendments to section 189.

The court asked defense counsel whether she intended to introduce new evidence to show defendant was convicted of murder based on an imputed malice theory. Counsel acknowledged she was "beating maybe a dead horse," but again claimed the "trial" was "tantamount to a plea" to avoid the special circumstance, there were no jury instructions, and they didn't know the basis for the judge's verdict at the bench trial. "Essentially, it was set up like, 'Okay, you're going to agree to a bench trial, and you're going to get to present your alibi defense. And if I don't believe it, you're guilty.' "

Defense counsel complained the prosecution failed to produce a gun, fingerprints, or any forensic evidence, the alibi witnesses were credible, the photographic lineup was

29.

improper, and defendant was improperly questioned after his arrest without his parents. Counsel said there was now DNA evidence that showed he was innocent, defendant filed a writ based on the DNA evidence, and it was denied as untimely. The prosecutor replied that its burden was to prove defendant was convicted of murder under a theory that was still valid after Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437), and defendant was guilty as the actual killer.

### The Court's Denial of the Petition

On October 28, 2024, after hearing the parties' arguments, the court stated it considered defense counsel's offer of proof to introduce evidence at the evidentiary hearing to show the identification testimony at the bench trial was insufficient, defendant's alibi was supported by substantial evidence, and the defense would call an expert about resentencing. However, the court stated defendant should raise these issues in a petition for a writ of habeas corpus instead of the section 1172.6 evidentiary hearing. The court also stated that defendant's proposed evidence about the Racial Justice Act was not relevant in a section 1172.6 proceeding.

The court said it understood defense counsel's argument was that there was now insufficient evidence to prove defendant was the shooter beyond a reasonable doubt, but "[t]hat's not a natural and probable consequences theory. This was a trial. There was significant stipulated evidence, but I'm aware of no law that prevents the Court at [a section] 1172.6 [hearing] from considering stipulated evidence."

> "I am finding, therefore, as the factfinder [at the evidentiary hearing], that there is and was sufficient evidence beyond a reasonable doubt to conclude that the theory of murder at the time of the conviction was yet a valid theory of direct evidence that [defendant] was the actual shooter, that the People did not rely on a natural and probable consequences doctrine, and, therefore, if proceeding to trial today, the People have established beyond a reasonable doubt that there was a legally sufficient and appropriate method and theory of conviction, and, therefore, denying the petition."

30.

On November 15, 2024, defendant filed a timely notice of appeal from the court's denial of his section 1172.6 petition.

**DISCUSSION**

As explained above, appellate counsel filed a brief with this court pursuant to *Wende* and *Delgadillo*. The brief also included counsel's declaration that defendant was advised he could file his own brief with this court. This court also advised defendant that he could file a supplemental letter brief.

On December 12, 2025, defendant filed a letter brief, stated his counsel from the section 1172.6 proceedings assisted him in composing the letter brief, and raised several issues about the court's denial of his petition and other matters. We address his issues and affirm the trial court's denial of his petition.[14]

### I. Senate Bill 1437 and Section 1172.6

We begin with Senate Bill 1437, which became effective in 2019 and "altered the substantive law of murder in two areas. First, with certain exceptions, it narrowed the application of the felony-murder rule by adding section 189, subdivision (e).... Under that provision, 'A participant in the perpetration or attempted perpetration of a [specified felony] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [s]ection 190.2.' " (*People v. Curiel* (2023) 15 Cal.5th 433, 448 (*Curiel*).)

---

**14** In support of his letter brief, defendant filed documentary exhibits consisting of defense counsel's brief filed in the trial court prior to the section 1172.6 evidentiary hearing, and the information that charged him with murder and the robbery-murder special circumstance.

31.

"Second, Senate Bill 1437 imposed a new requirement that, except in cases of felony murder, 'a principal in a crime shall act with malice aforethought' to be convicted of murder.  [Citation.]  'Malice shall not be imputed to a person based solely on his or her participation in a crime.'  [Citation.]  One effect of this requirement was to eliminate liability for murder as an aider and abettor under the natural and probable consequences doctrine.  [Citation.]  …. Thus, under prior law, a defendant who aided and abetted an intended assault could be liable for murder, if the murder was the natural and probable consequence of the intended assault.  [Citation.]  The defendant need not have intended the murder or even subjectively appreciated the natural and probable consequences of the intended crime.  [Citation.]  Senate Bill 1437 ended this form of liability for murder."  (*Curiel, supra*, 15 Cal.5th at p. 449.)

Senate Bill 1437's amendments "maintained the viability of murder convictions based on implied malice, and the definition of implied malice remains unchanged."  (*People v. Clements* (2022) 75 Cal.App.5th 276, 298 (*Clements*).)

Senate Bill 1437 "added former section 1170.95, which created a process for those convicted of murder under now obsolete accomplice liability theories to seek vacatur and resentencing.  Effective January 1, 2022, the Legislature revised section 1170.95 through the passage of Senate Bill No. 775 (2021-2022 Reg. Sess.) (Senate Bill 775).  Petitioners who were convicted of attempted murder and manslaughter under now obsolete theories may also seek relief."  (*People v. Ramos* (2025) 112 Cal.App.5th 174, 183; *People v. Reyes* (2023) 97 Cal.App.5th 292, 295.)

### A.  The Prima Facie Determination

Section 1172.6 states that a petitioner may file for resentencing if "convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter."  (§ 1172.6, subd. (a)(1).)

32.

The petitioner must declare: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine. [¶] (2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder. [¶] (3) The petitioner could not presently be convicted of murder or attempted murder because of changes to [s]ection 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a)(1)-(a)(3).)

After counsel is appointed and the parties have the opportunity to submit briefing, "the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief." (§ 1172.6, subd. (c).)

In making the prima facie determination, the trial court may look at the record of conviction to determine whether a petitioner has made the prima facie showing. (*People v. Lewis* (2021) 11 Cal.5th 952, 971.) The record of conviction consists of the charging documents, closing arguments, jury instructions, and verdict forms. (*People v. Lovejoy* (2024) 101 Cal.App.5th 860, 865; *People v. Harden* (2022) 81 Cal.App.5th 45, 56; *People v. Jenkins* (2021) 70 Cal.App.5th 924, 935.) If the defendant was convicted after a bench trial, the court's findings in reaching a verdict may be relied on to make the prima facie determination. (*People v. Anaya*, *supra*, 117 Cal.App.5th at pp. 618–619, 621–622.)

The court cannot engage in factfinding or weighing the credibility of witnesses to make the prima facie determination. (*People v. Lovejoy*, *supra*, 101 Cal.App.5th at p. 865.)

## B. The Evidentiary Hearing

"Once a petitioner establishes a prima facie case for relief and the superior court issues an order to show cause, the matter proceeds to an evidentiary hearing." (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951 (*Vargas*).)

"At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to [s]ection 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)

> "The admission of evidence in the [evidentiary] hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of [s]ection 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens." (§ 1172.6, subd. (d)(3).)

At the evidentiary hearing, the trial court acts as an independent fact finder, makes credibility determinations, weighs the evidence, and determines whether the prosecution met its burden to prove beyond a reasonable doubt that defendant was still guilty of murder after the amendments to sections 188 and 189. (*People v. Rodriguez* (2024) 103 Cal.App.5th 451, 457 (*Rodriguez*); *People v. Gudiel* (2024) 107 Cal.App.5th 848, 858; *Clements*, *supra*, 75 Cal.App.5th at p. 298; *Harden*, *supra*, 81 Cal.App.5th at p. 51.)

"Although the parties may offer new or additional evidence to meet their respective burdens, section 1172.6, subdivision (d)(3) does not contemplate a whole new trial on all the elements of murder. [Citation.] Rather, '[t]he retroactive relief provided by [section 1172.6] is a legislative "act of lenity" intended to give defendants serving

otherwise final sentences the benefit of ameliorative changes to applicable criminal laws and does not result in a new trial or increased punishment.' [Citations.] Thus, the focus at the evidentiary hearing phase of [a section] 1172.6 petition is 'on evidence made relevant by the amendments to the substantive definition of murder,' which, in the context of section 188, requires 'the prosecution to prove that all principals to a murder acted with malice aforethought.' " (*Vargas, supra,* 84 Cal.App.5th at p. 952.)

If the prosecution fails to meet its burden of proof, "the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).)

If the trial court "finds beyond a reasonable doubt that *the petitioner is guilty of murder notwithstanding the amendments to sections 188 and 189*, the petitioner is ineligible for relief under section 1172.6." (*Vargas, supra,* 84 Cal.App.5th at p. 951, italics added.)

**C. Appellate Review After the Evidentiary Hearing**

On appeal from the trial court's denial of a section 1172.6 petition after an evidentiary hearing, we review questions of law independently, and the court's evidentiary rulings for an abuse of discretion. (*People v. Reyes* (2023) 14 Cal.5th 981, 988; *People v. Waidla* (2000) 22 Cal.4th 690, 724.)

"We review the trial judge's factfinding for substantial evidence. [Citation.] We ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact

finder's findings beyond a reasonable doubt." (*Clements*, *supra*, 75 Cal.App.5th at p. 298.)

With these principles in mind, we turn to the trial court's ruling and petitioner's claims of the court's alleged errors.

## II. The Trial Court's Denial of Defendant's Petition is Supported by Substantial Evidence

The court denied defendant's petition after the evidentiary hearing because it found the evidence from his bench trial proved beyond a reasonable doubt that he was convicted of second degree murder as the actual killer. The court's finding is supported by substantial evidence.

### A. Murder, Malice and Principals

"Second degree murder is 'the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.] Malice may be either express, i.e. when a defendant manifests an intention to kill, or implied. [Citation.] ' "Malice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " ' " (*Clements*, *supra*, 75 Cal.App.5th at p. 299.)

Imputed malice and implied malice are not the same doctrines. (*People v. Schell* (2022) 84 Cal.App.5th 437, 443–444.) The amendments enacted by Senate Bills 1437 and 775 "maintained the viability of murder convictions based on implied malice, and the definition of implied malice remains unchanged." (*Clements, supra,* 75 Cal.App.5th at p. 298.)

"Because direct evidence of a defendant's intent rarely exists, intent may be inferred from the circumstances of the crime and the defendant's acts." (*People v.*

*Sanchez* (2016) 63 Cal.4th 411, 457.) A defendant's purposeful act of firing towards the victim at close range, inflicting a mortal wound, supports an inference of malice and the intent to kill. (*People v. Smith* (2005) 37 Cal.4th 733, 742; *People v. Cardenas* (2020) 53 Cal.App.5th 102, 119–120; *People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690.) " 'All persons concerned in the commission of a crime, ... whether they *directly commit the act constituting the offense*, or aid and abet in its commission ... are principals in any crime so committed.' [Citation.] An aider an[d] abettor's 'guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state.' " (*People v. Krueger* (2025) 115 Cal.App.5th 431, 437, italics added, disapproved on other grounds in *People v. Lopez* (2026) __ Cal.5th __ [343 Cal.Rptr.3d 407, 418, fn. 6; 587 P.3d 587, 596-597, fn. 6].)

When the record "makes clear that [the petitioner] was the actual killer and the only participant in the killing," then he was not convicted pursuant to a now-invalid theory of imputed malice, and he is still guilty of murder after the amendments to sections 188 and 189. (*Delgadillo, supra,* 14 Cal.5th at p. 233.) "To the extent [a petitioner] means to argue that the natural and probable consequences doctrine or any other theory of imputed malice could apply to a sole perpetrator, that argument fails, as these abrogated theories necessarily require a second participant." (*People v. Love* (2025) 107 Cal.App.5th 1280, 1288.)

**B. Analysis**

As explained above, Senate Bill 1437 amended section 189, subdivision (e)(1) as to the felony-murder rule, and now states that the participant in a qualifying felony is still guilty of murder if he was "the actual killer." (*Harden, supra,* 81 Cal.App.5th at pp. 50-51.) The legislation eliminated the natural and probable consequences doctrine and amended section 188, subdivision (a)(3) to state that " '[m]alice shall not be imputed to a person based solely on his or her participation in a crime.' " (*Harden, supra,* 81

Cal.App.5th at pp. 50-51.) The statutory amendments did not eliminate a person's culpability for murder if that person was the actual killer.

When defendant filed his section 1172.6 petition, the trial court complied with the statute and appointed counsel and held a hearing on the prima facie issue. The court stated it could not make the prima facie determination from the record of defendant's bench trial because it would have to make factual and credibility findings, which was not permitted for the prima facie finding. It issued the OSC and stated it would conduct an evidentiary hearing.

The court considered the entirety of the record introduced at the bench trial, and found beyond a reasonable doubt that defendant was still guilty of murder after the amendments to sections 188 and 189 because he was the actual killer. The court's finding is supported by substantial evidence. While the robbery-murder special circumstance was originally alleged, the court granted the prosecution's motion to strike the allegation based on the parties' agreement for the bench trial. The prosecution's only theory at defendant's bench trial in 1994 was that he was the actual killer, and it did not rely on the felony-murder rule or the natural and probable consequences doctrine. Even if it had relied on felony murder, however, the evidence from the bench trial still showed that defendant was the actual killer of the victim.

Defendant was identified by both E.T., the store clerk who ran outside, and M.J., the witness in the parking lot, as the man who confronted and shot the victim. W.E. also identified defendant as the man who was running away from the liquor store shortly after the murder. While defendant called alibi witnesses at his bench trial, their testimony about defendant's whereabouts was undermined by their prior inconsistent statements to Detective Stokes, which left open a window of time for defendant to be at the liquor store at the time of the murder.

At a section 1172.6 evidentiary hearing, the trial court acts as the independent fact finder, makes credibility determinations, and weighs the evidence. In denying his section

38.

1172.6 petition, the court herein clearly discounted the credibility of defendant's alibi witnesses. The court's finding that defendant was the actual killer is supported by substantial evidence, he was not eligible for resentencing as a matter of law, and the court correctly denied his section 1172.6 petition after the evidentiary hearing.

## III. Defendant Was Convicted After a Bench Trial

In his letter brief, defendant repeats the arguments his counsel repeatedly made throughout the section 1172.6 proceedings, that he was not convicted of murder after a trial, and he entered a plea in order to avoid the felony-murder special circumstance. "In my case, I took a plea to avoid prosecution under the felony murder rule. The nature of that plea has been a constant source of issues. [¶] In a nutshell, I agreed to a truncated bench trial on a second-degree-murder charge at which I was only allowed to present an alibi defense to avoid prosecution under the felony murder rule."

Defendant asserts the trial court improperly prevented him from introducing the DNA evidence at the section 1172.6 evidentiary to show "that I was not the shooter because the prosecution did not present a theory of felony murder at trial. But the prosecution did not present that theory because I took the plea to avoid prosecution under that theory." Defendant requests this court resolve whether he "took" a plea "to avoid prosecution under the felony murder rule, qualifying me for relief under §1172.6."

### A. Guilty Pleas, Trials and Slow Pleas

"A plea of guilty, of course, is the most serious step a defendant can take in a criminal prosecution. It operates first as a waiver of formal defects in the accusatory pleading that could be reached by demurrer. [Citations.] Next, because there will be no trial the plea strips the defendant of such fundamental protections as the privilege against self-incrimination, the right to a jury, and the right of confrontation. [Citations.] As to the merits, the plea is deemed to constitute a judicial admission of every element of the offense charged. [Citation.] Indeed, it serves as a stipulation that the People need introduce no proof whatever to support the accusation: the plea ipso facto supplies both

39.

evidence and verdict.  [Citation.]  'A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment.'  [Citation.]  Finally, it severely restricts the defendant's right to appeal from the ensuing judgment."  (*People v. Chadd* (1981) 28 Cal.3d 739, 748.)

" '[A] trial, even one where a defense is voluntarily forgone, is fundamentally different from a guilty plea.'  [Citation.]  At trial, the state is put to its burden of proof as to the charges, whereas a plea ' "serves as a stipulation that the People need introduce no proof whatever to support the accusation" and " 'is itself a conviction.' " ' "  (*People v. Morelos* (2022) 13 Cal.5th 722, 745.)

A slow plea has been defined as "[a]n agreed-upon disposition of a criminal case via any one of a number of contrived procedures which does not require the defendant to admit guilt but results in a finding of guilt on an anticipated charge and, usually, for a promised punishment."  (*People v. Tran* (1984) 152 Cal.App.3d 680, 683, fn. 2.)

"Perhaps the clearest example of a slow plea is a bargained-for submission on the transcript of a preliminary hearing in which the only evidence is the victim's credible testimony, and the defendant does not testify and counsel presents no evidence or argument on defendant's behalf.  Such a submission is 'tantamount to a plea of guilty' because 'the guilt of the defendant [is] apparent on the basis of the evidence presented at the preliminary hearing and ... conviction [is] a foregone conclusion if no defense [is] offered.' "  (*People v. Wright* (1987) 43 Cal.3d 487, 496 (*Wright*), abrogated on other grounds in *People v. Mosby* (2004) 33 Cal.4th 353, 360.)  If a defendant enters a slow plea, the court must advise the defendant and obtain waivers of his constitutional rights.  (*In re Tellez* (2024) 17 Cal.5th 77, 91.)

"Submissions that are not considered slow pleas include those in which (1) the preliminary hearing involves substantial cross-examination of the prosecution witnesses and the presentation of defense evidence or (2) the facts revealed at the preliminary

examination are essentially undisputed but counsel makes an argument to the court as to the legal significance to be accorded them." (*Wright*, *supra*, 43 Cal.3d at p. 496.)

There are a "wide variety of submissions that fall between these extremes." (*Wright, supra*, 43 Cal.3d at p. 496.) "When the defendant reserves the right to testify or offer evidence and the record shows no sign of negotiations between defendant and prosecution, the submission may or may not be a slow plea. Some defendants submit their cases on the transcript simply to achieve the effect of a guilty plea without actually having to admit guilt in open court and on the record. Others submit not to contest guilt but to avoid expensive or burdensome trials or to impress upon the trial judge the mitigating factors for sentencing. Some defendants appear to concede guilt as to one or more of the offenses but contest it as to others." (*Wright*, *supra*, 43 Cal.3d at p. 496.)

"An appellate court, in determining whether a submission is a slow plea, must assess the circumstances of the entire proceeding. It is not enough for a reviewing court to simply count the number of witnesses who testified at the hearing following the submission. *A submission that prospectively appeared to be a slow plea may turn out to be part of a full-blown trial if counsel contested the sufficiency of evidence for those counts or presented another potentially meritorious legal argument against conviction.* Conversely, a submission that did not appear to be a slow plea because the defendant reserved the right to testify and call witnesses or to argue the sufficiency of the evidence [citation] may turn out to be a slow plea *if the defense presented no evidence or argument contesting guilt.*" (*Wright*, *supra*, 43 Cal.3d at pp. 496–497, italics added.)

"*If it appears on the whole that the defendant advanced a substantial defense, the submission cannot be considered to be tantamount to a plea of guilty.* Sometimes, a defendant's best defense is weak. He may make a tactical decision to concede guilt as to one or more of several counts as part of an overall defense strategy. A submission under these circumstances is not a slow plea, and the trial court is not constitutionally

41.

compelled by *Boykin* and *Tahl*[15] to administer the guilty-plea safeguards to assure that the tactical decision is voluntary and intelligent. The advisements and waivers in such a case are required only as a matter of the judicial policies." (*Wright*, *supra*, 43 Cal.3d at p. 497, italics added.)

### B. Analysis

We have set forth the entirety of the proceedings leading to defendant's bench trial in 1994, and the record unequivocally shows that defendant did not plead guilty or even enter a "slow plea" to murder. Defendant waived his right to a jury trial, stated he was not forced or coerced to waive a jury trial, and expressly agreed to a bench trial pursuant to the stipulation as to the nature of the evidence that would be introduced by the prosecution and the defense.

The prosecution agreed to strike the special circumstance. It was still required to prove beyond a reasonable doubt that defendant was guilty of murder, and it is clear the prosecution's only theory at the bench trial was that defendant was the actual killer. Moreover, the defense presented five witnesses who testified about defendant's possible alibi, thus challenging whether the prosecution had met its burden of proof. Defense counsel "contested the sufficiency of [the] evidence," presented "a potentially meritorious legal argument against conviction," and "advanced a substantial defense," such that defendant did not enter a plea or even a slow plea, and instead was convicted after a bench trial. (*Wright*, *supra*, 43 Cal.3d at pp. 496–497.)

Defendant argues he is eligible for resentencing pursuant to section 1172.6, subdivision (a)(2), because he was convicted after he " '**accepted a plea offer in lieu of a trial at which [he] could have been convicted of murder** or attempted murder,' " and he purportedly accepted a "plea" in exchange for striking the felony-murder special circumstance. (Bold in original.)

---

15      *Boykin v. Alabama* (1969) 395 U.S. 238 and *In re Tahl* (1969) 1 Cal.3d 122.

Defendant's argument turns the statute on its head. Defendant's bench trial was held in 1994, prior to the effective dates of the amendments to sections 188 and 189, which raised the possibility that he was convicted of second degree murder based on a now-invalid theory. The trial court found his section 1172.6 petition stated a prima facie case, issued an OSC, and set the evidentiary hearing.

By issuing the OSC, the trial court acknowledged defendant was potentially eligible for resentencing under section 1172.6. After the evidentiary hearing, the court did not deny defendant's petition because he was convicted after a bench trial, plea, a "slow plea," or because the felony-murder special circumstance was stricken. Instead, the trial court correctly denied his petition after the evidentiary hearing because it found beyond a reasonable doubt that he was guilty of second degree murder under a theory that was still valid after the amendments to sections 188 and 189—that he was the actual killer.

Also in his letter brief, defendant states the question about whether his conviction resulted from "a plea or trial" is also an issue at a hearing on his motion for relief filed pursuant to section 1172.1. Defendant claims the prosecution in the section 1172.1 case "is now arguing that it was a plea, which means the judge and district attorney must agree in order to grant me relief under § 1172.1. A finding that it was a trial allows the judge to resentence me whether the district attorney agrees or not." Defendant requests this court to resolve this issue because "a decision on this matter is crucial to resolving the …. [sections] 1172.6 and 1172.1 issues presently before the Fresno County Superior Court."

Defendant did not file a section 1172.1 petition in this case. His request for this court to resolve an alleged contested issue involving a section 1172.1 petition for resentencing, which he claims is pending before the trial court in another matter, is "wholly unrelated to the denial of his section 1172.6 petition for resentencing" and is

"not cognizable" in this appeal. (*People v. Hernandez* (2024) 103 Cal.App.5th 1111, 1117.)[16]

Based on the record before this court, defendant was convicted of second degree murder after a bench trial, and the trial court's decision to deny his section 1172.6 petition for resentencing was not based on whether he was convicted after a jury or bench trial, or that the felony murder special circumstance was stricken. Instead, it was based on finding that defendant was still guilty of murder as the actual killer, and the court's decision is supported by substantial evidence.

## IV. Defendant's Motion to Introduce DNA Evidence

Also in his letter brief, defendant asserts "the issue at the heart of this appeal remains" that he has always "maintained [his] innocence." Defendant states that he wanted to prove his innocence at a section 1172.6 evidentiary hearing because he was recently granted parole and "leaving prison with a 31-year-old attempted robbery on my record is preferable to a second-degree murder."

---

[16] We note that as of January 1, 2024, section 1172.1 states the trial court "may recall a sentence and resentence a defendant on its own motion 'at any time if the applicable sentencing laws at the time of original sentencing are subsequently changed by new statutory authority or case law.' " (*People v. Brinson* (2025) 112 Cal.App.5th 1040, 1046.) "A defendant is not entitled to file a petition seeking relief from the court under this section. If a defendant requests consideration for relief under this section, the court is not required to respond." (§ 1172.1, subd. (c).) Section 1172.1, subdivision (c) "expressly denies defendants the right to file a petition for resentencing under that section, and expressly excuses the trial court from acting on any such request that a defendant might nevertheless file." (*People v. Hodge* (2024) 107 Cal.App.5th 985, 993.)

"If the court *has* recalled the sentence on its own motion, the court shall not impose a judgment on any necessarily included lesser offense or lesser related offense if the conviction was a result of a plea bargain without the concurrence of both the defendant and the district attorney of the county in which the defendant was sentenced, or the Attorney General if the Department of Justice originally prosecuted the case." (§ 1172.1, subd. (a)(4), italics added.)

Defendant states he moved to introduce evidence at the section 1172.6 evidentiary hearing to prove he was not the shooter "because the DNA tests of the victim's fingernail scrapings show that I was not the person who tussled with him, then shot him. I have additional evidence to present; however, the issue here is not evidentiary, it is about whether I qualify for relief under … [section] 1172.6."

## A. Section 1172.6 and Relevant Evidence

A section 1172.6 petition is limited to the issues implicated by that statute and the amendments enacted by Senate Bills 1437 and 775. (See, e.g., *People v. DeHuff* (2021) 63 Cal.App.5th 428, 438; *People v. Farfan*, *supra*, 71 Cal.App.5th at p. 947.) The statute does not provide the petitioner with " 'a do-over on factual disputes that have already been resolved' " at their trials. (*People v. Farfan*, at p. 947.)

"[T]he focus at the evidentiary hearing phase of a [section] 1172.6 petition is '*on evidence made relevant by the amendments to the substantive definition of murder*,' which, in the context of section 188, requires 'the prosecution to prove that all principals to a murder acted with malice aforethought.' " (*Vargas, supra,* 84 Cal.App.5th at p. 952, italics added; *Rodriguez, supra,* 103 Cal.App.5th at p. 457; *Gomez v. Superior Court* (2024) 100 Cal.App.5th 778, 788.)

It is settled that a section 1172.6 proceeding does not permit a defendant to litigate anew any trial issue or allow a challenge to factfinding from the original trial that defendant would like to revisit. (*Rodriguez, supra*, 103 Cal.App.5th at p. 457.) As explained in *Palacios, supra,* 101 Cal.App.5th 942: "Just as a defendant may not raise a new evidentiary objection on appeal, a petitioner who failed to make a specific evidentiary objection at trial may not raise the issue for the first time at a resentencing hearing. This is consistent with the limited nature of section 1172.6 proceedings and reflects a reasonable legislative determination that resentencing hearings are not the proper forum to litigate issues that could have been raised at trial." (*Id*. at p. 954.)

**B. Homicide Defenses**

The sole question at a section 1172.6 evidentiary hearing "is whether the petitioner committed murder under a still-valid theory." (*Clements, supra,* 75 Cal.App.5th at p. 294.) "[T]he burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder … under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)

In *People v. Mares* (2024) 99 Cal.App.5th 1158 (*Mares*), the court addressed whether a defendant could raise new defenses at a section 1172.6 hearing that were not raised at trial. The defendant in *Mares* was charged with murder. The evidence presented at the preliminary hearing showed the defendant fought with and stabbed the victim. The defendant pleaded guilty to voluntary manslaughter. (*Mares*, at p. 1162.) The defendant subsequently filed a section 1172.6 petition. The trial court found the petition failed to state a prima facie case because the record of conviction showed he was convicted by plea as the actual killer. (*Mares*, at p. 1163.)

*Mares* held the defendant's section 1172.6 petition was properly denied because the prosecution pursued the murder conviction only based on the theory that he was the actual killer, and "[n]othing in the record suggests [he] could have benefitted from Senate Bill 1437's changes in the law." (*Mares*, *supra*, 99 Cal.App.5th at p. 1166.) *Mares* explained that for a defendant to show he was entitled to relief under section 1172.6, "he must assert he would have defended himself by offering facts to support a murder theory that is now abrogated." (*Mares*, at p. 1166.)

> "It is important to understand it is not relevant if [the defendant] wished to claim (for instance) that he was misidentified and another person committed the crime. That was a defense that was available to him at the time of his plea. Senate Bill 1437 has no bearing on it. *New evidence of misidentification could support a petition for a writ of habeas corpus,* but it would not show that he cannot be convicted 'because of' the changes to the law, as required by section 1172.6." (*Mares*, *supra*, 99 Cal.App.5th at p. 1168, italics added.)

*Mares* further held:

"Had [the defendant] gone to trial, he possibly could, for instance, have challenged the admission of his confession. [Citation.] He may instead have acknowledged he was the killer but argued self-defense or some other justification. [Citation.] These options were available to him at the time of his plea, without any change in the law. [The defendant] did not plead guilty to murder, he instead pled to manslaughter, and perhaps a jury would have returned a manslaughter verdict if he had gone to trial. Arguing today that he could not be convicted of murder for any of these reasons would not show he cannot be convicted 'because of the changes to [s]ection 188 or 189' [citation], which is what he needs to establish a prima facie case." (*Mares, supra*, 99 Cal.App.5th at p. 1168.)

## C. Analysis

Defendant asserts the trial court erroneously denied his motion to introduce the DNA evidence at the section 1172.6 evidentiary hearing, "because the prosecution did not present a theory of felony murder at trial. But the prosecution did not present that theory because I took the plea to avoid prosecution under that theory." As explained above, the trial court's denial of defendant's petition was not based on whether defendant was convicted after a trial or a plea, or whether the prosecution relied on the felony-murder rule. Defendant was still guilty of murder as the actual killer even if the prosecution had relied on the felony-murder rule.

Moreover, the court correctly denied his motion to introduce DNA evidence, regardless of whether he entered a plea or was convicted after a trial, because a section 1172.6 evidentiary hearing only addresses whether a petitioner was convicted of murder under an imputed malice theory that was now invalid. In denying his petition, the court found the evidence at the bench trial proved beyond a reasonable doubt that defendant was the actual killer and he was still guilty of murder after the statutory amendments. As explained in *Mares*, his attempt to introduce new evidence on the issue of identity was not relevant to the court's decision to grant or deny his section 1172.6 petition at the evidentiary hearing.

47.

In denying defendant's motion to introduce DNA evidence, the court stated a petition for writ of habeas corpus was the appropriate vehicle to raise his contentions about newly discovered evidence. Defense counsel said a writ petition was filed based on the DNA evidence, but "thrown out" as untimely in 2012. As noted above, this court's own records show defendant, in propria persona, filed a writ petition in the trial court in 2013 and argued the DNA evidence showed his actual innocence. The trial court denied the petition and held "[t]he fact that [defendant's] DNA was not underneath the fingernails of the victim's right hand does not demonstrate [he] is innocent of his [murder] conviction." (*In re DeShawn Jackson*, *supra*, F068515; Exhibit E.) Defendant then filed a petition before this court raising the same issues, and it was denied in 2013. There is no indication these petitions were denied because they were untimely.

Even assuming, without deciding, the trial court abused its discretion in denying defendant's motion to introduce the DNA evidence, the record before this court shows that any error was necessarily harmless. The evidence at defendant's bench trial was that M.J. said the suspect approached the victim and started to grab at the bicycle, and the victim did not let go of it. The suspect again told the victim to let go of the bicycle, and the victim continued to hold onto it. M.J. said at that point, this same suspect pulled out a gun, fired one shot into victim's chest, and ran away. When the police arrived at the scene, the victim was lying on the ground and the bicycle was approximately five feet away from him. The bicycle was processed for fingerprints and only the victim's prints were found.

Detective Stokes attended the autopsy and reported there was no evidence on the victim's body to show "there was a struggle in which [the victim] was struck or struck anyone. This was observed in that there were no wounds or lacerations or bruises to the victim's hands, arms or face, indicating a fight." The autopsy report stated scrapings were taken from under the victim's fingernails, but there were no wounds or abrasions on the victim's arms or hands.

The absence of defendant's DNA in the fingernail scrapings from the victim does not establish his actual innocence since there is no evidence in the record before this court that the victim and the gunman physically interacted in any way.

After independent review of the record, we find no reasonably arguable factual or legal issues exist.[17]

## DISPOSITION

The judgment is affirmed.

---

[17] Defendant is not foreclosed from filing another petition for writ of habeas corpus. In his letter brief, defendant states that he was recently granted parole. Depending on his custody status, defendant may instead file a motion pursuant to section 1473.7, subdivision (a)(2), that states a person "who is no longer in criminal custody may file a motion or vacate a conviction" based on "[n]ewly discovered evidence of actual innocence."